**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

NICOLE HERRERA §
MENDEZ, in her individual capacity and in §
her capacity as an heir §
of Jesus Benito Garcia, Sr.; and LISA §
GARCIA, AMANDA VICTORIA §
GARCIA, JESSICA LISA GARCIA, §
JESUS BENITO GARCIA JR., and §    **CIVIL ACTION NO. 5:22-CV-198**
THOMAS LEE GARCIA, in their §
individual capacities, §
§
　　　　Plaintiffs, §
§    **JURY TRIAL DEMAND**
v. §
§
BRANDIN JOHN MORAN, in §
his individual capacity; §
and THE COUNTY OF BEXAR, TEXAS, §
§
　　　　Defendants. §

**ORIGINAL COMPLAINT**

1.  This lawsuit is about a disastrous and unlawful use of deadly force by a Bexar County

Sheriff's Deputy.

2.  On March 9, 2020, Elmendorf Police Sergeant David Reyes responded to a domestic

disturbance between Jesus Benito Garcia, Sr. ("Mr. Garcia") and his wife, Lisa ("Ms. Garcia").

He was the first officer to arrive at the scene. Mr. Garcia pleaded for his wife not to leave him

and warned that he would harm himself. For several long minutes Sergeant Reyes was alone with

the Garcias in their small trailer using de-escalation techniques. Throughout this approximately

four-minute encounter Sergeant Reyes refrained from using any force at all, much less deadly

force, because other reasonable methods for resolving the domestic disturbance existed.

3.   Bexar County Sheriff's Deputy Brandin Moran was the second officer to respond. In sharp contrast with Sergeant Reyes's de-escalation efforts, Deputy Moran almost immediately and without any warning fired seven gunshots, five of which hit Mr. Garcia and ultimately killed him. Approximately ten *seconds* passed between Deputy Moran's arrival and his use of deadly force. No change in circumstances of the domestic disturbance overseen by Sergeant Reyes justified Deputy Moran's use of force.

4.   For about seventeen minutes Deputy Moran did nothing to help the man he just shot. He ignored Bexar County Sheriff's Office policy requiring him to render aid and his own extensive first aid training while he paced around the inside of the Garcias' trailer. When EMS arrived they performed CPR on Mr. Garcia for more than twenty minutes before ultimately pronouncing him dead.

5.   Mr. Garcia was a husband and a father of five. While nothing can bring Mr. Garcia back to his family, through this civil action his loved ones seek redress from Bexar County and Deputy Moran for the deprivation of their rights secured under the Constitution and laws of the United States.

## PARTIES

6.     Plaintiff NICOLE HERRERA MENDEZ is the daughter of Jesus Benito Garcia, Sr. and resides in Bexar County, Texas. She is suing in her capacity as an heir of Jesus Benito Garcia, Sr. pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code Ann. § 71.021, for injuries resulting from the deprivation of Jesus Benito Garcia, Sr.'s constitutional rights. Plaintiffs, including NICOLE HERRERA MENDEZ, are the only heirs of Jesus Benito Garcia, Sr. *See* Tex. Estates Code Ann. § 201. Mr. Garcia died intestate with minimal assets and no known statutory basis that would necessitate an administration of his estate. *See id.* § 306.002.

All heirs have entered into and duly executed a Family Settlement Agreement. Among other provisions, the Family Settlement Agreement: (1) provides for the distribution among the heirs of any current or future assets of the Estate of Jesus Benito Garcia, Sr. ("Estate"); (2) provides for the payment of any debt of the Estate; and (3) expresses the desire of all heirs for NICOLE HERRERA MENDEZ to bring claims in this suit under the Texas Survival Statute on behalf of Jesus Benito Garcia, Sr.

7.   NICOLE HERRERA MENDEZ also brings suit in her individual capacity as a surviving child of Jesus Benito Garcia, Sr. for injuries related to her mental anguish and the loss of companionship resulting from the death of her father pursuant to the Texas Wrongful Death Act, Tex. Civ. Prac. & Remedies Code Ann. § 71.004.

8.   Plaintiff LISA GARCIA is the spouse of Jesus Benito Garcia, Sr. and resides in Bexar County, Texas. She is suing in her individual capacity as the surviving spouse of Jesus Benito Garcia, Sr. for injuries related to mental anguish and the loss of companionship resulting from the death of her husband pursuant to the Texas Wrongful Death Act.

9.   Plaintiff AMANDA VICTORIA GARCIA is the daughter of Jesus Benito Garcia, Sr. and resides in Bexar County, Texas. She is suing in her individual capacity as a surviving child of Jesus Benito Garcia, Sr. for injuries related to mental anguish and the loss of companionship resulting from the death of her father pursuant to the Texas Wrongful Death Act.

10. Plaintiff JESSICA LISA GARCIA is the daughter of Jesus Benito Garcia, Sr. and resides in Atascosa County, Texas. She is suing in her individual capacity as a surviving child of Jesus Benito Garcia, Sr. for injuries related to mental anguish and the loss of companionship resulting from the death of her father pursuant to the Texas Wrongful Death Act.

11. Plaintiff JESUS BENITO GARCIA JR. is the son of Jesus Benito Garcia, Sr. and resides in Marion County, Indiana. He is suing in his individual capacity as a surviving child of Jesus Benito Garcia, Sr. for injuries related to mental anguish and the loss of companionship resulting from the death of his father pursuant to the Texas Wrongful Death Act.

12. Plaintiff THOMAS LEE GARCIA is the son of Jesus Benito Garcia, Sr. and resides in Kleburg County, Texas. He is suing in his individual capacity as a surviving child of Jesus Benito Garcia, Sr. for injuries related to mental anguish and the loss of companionship resulting from the death of his father pursuant to the Texas Wrongful Death Act.

13. Defendant BRANDIN JOHN MORAN ("Deputy Moran") resides in Bexar County, Texas. At all relevant times, Deputy Moran was employed by the Bexar County Sheriff's Office (the "BCSO") and was acting within the scope of his employment and under color of state law within the meaning of 42 U.S.C. § 1983. Deputy Moran is sued in his individual capacity.

14. Defendant COUNTY OF BEXAR, TEXAS ("Bexar County") is a state-created local governmental organization that may be served by serving its County Judge, Nelson W. Wolff, pursuant to Fed. R. Civ. P. 4(j)(2)(B) and section 17.024(a) of the Texas Civil Practice and Remedies Code.

## JURISDICTION AND VENUE

15. Plaintiffs bring this suit under 42 U.S.C. § 1983, which provides a civil cause of action against persons who, under color of law, deprive a person of constitutional rights. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3), (a)(4) (civil rights) as this action is brought pursuant to 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the actions that give rise to the claims took place in Bexar County.

17. The Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS

### I.  The Events of March 9, 2020

18. On Monday, March 9, 2020, Jesus Benito Garcia, Sr., Lisa Garcia, and their son Jesus Benito Garcia Jr. ("Jr.") were at their home in Elmendorf, Texas.

19. Around 3:00 PM, a neighbor observed Ms. Garcia and Mr. Garcia having a dispute outside of their home and called 911.

20. Several minutes later, Sergeant David Antonio Reyes, with the Elmendorf Police Department, was the first law enforcement officer to arrive at the Garcia home.

21.  Sergeant Reyes knocked on the door and Jesus, Jr. answered. Complying with Reyes' instructions, Jesus, Jr. exited the home with his dog and kneeled on the ground. Reyes then entered the home with his service weapon drawn.

22. When Sergeant Reyes entered the home, Mr. and Ms. Garcia were engaged in an emotional exchange.

23. Mr. Garcia was holding a screwdriver to his own neck and was pleading with his wife not to leave him. Ms. Garcia was crying. She feared that her husband would harm himself.

24. Sergeant Reyes asked Mr. Garcia to drop his knife. Ms. Garcia responded that Mr. Garcia was holding a screwdriver.

25. Mr. Garcia never threatened to attack or harm Ms. Garcia, Sergeant Reyes, or anyone else, either verbally or physically.

26. At no point did Reyes tell dispatch that Mr. Garcia had a gun or that either Ms. Garcia or Reyes himself were at risk of imminent harm.

27. At no point did Mr. Garcia state that he would attack anyone with the screwdriver or otherwise verbally threaten to harm anyone other than himself. Nor did Mr. Garcia brandish the screwdriver at Ms. Garcia, Sergeant Reyes or anyone else.

28. Several minutes later, Deputy Moran arrived on scene. He entered the home aggressively and with his gun drawn.

29. At that time, Ms. Garcia was on the floor next to the couch and her husband was kneeling by her, with the screwdriver still at his own neck.

30. In less than 10 seconds after bursting into the home, Deputy Moran fired seven shots. Five of Moran's bullets hit Mr. Garcia, who fell on top of his wife.

31. Deputy Moran never identified himself as an officer or warned Mr. Garcia that he would shoot him if he did not drop the screwdriver.

32. When Deputy Moran entered the home, Sergeant Reyes began holstering his weapon and reaching for his taser. Upon information and belief, Reyes intended to continue his attempts to de-escalate the situation, by switching from a gun to a taser, in preparation for using less deadly force against Mr. Garcia.

33. The BCSO policy manual regarding the use of force prioritizes the activities its officers should take when responding to a call: (1) stop violent behavior with the least amount of force necessary, (2) rescue victims, (3) provide medical assistance to victims and actors, and (4) preserve the crime scene.

34. Any reasonable officer in Moran's position would have known that shooting a gun in the direction of Mr. and Ms. Garcia was clearly excessive, where other measured and proportionate steps were available to the officers, including but not limited to Sergeant Reyes' use of a taser.

35. Any reasonable officer in Deputy Moran's position would have known that firing his weapon in the direction of Mr. Garcia posed a great risk of harm to Ms. Garcia given her proximity to Mr. Garcia.

36. After Moran shot Mr. Garcia, Sergeant Reyes checked Ms. Garcia for injuries and took her outside.

37. After shooting Mr. Garcia, Deputy Moran stated over the law enforcement scanner, "I got one." He then proceeded to walk back and forth inside the home.

38. Upon information and belief, Deputy Moran is trained in tactical first aid, general first aid, cardiopulmonary resuscitation, and tactical trauma care

39. Despite his extensive training, and in violation of BCSO policy, Deputy Moran did not attempt to render any form of life-saving medical assistance to Mr. Garcia. For seventeen minutes, Deputy Moran did nothing to save the life of the man he shot; he just stood by while Mr. Garcia lay bleeding on the floor.

40. At approximately 3:30 PM, emergency medical personnel arrived at the scene and immediately began to perform cardiopulmonary resuscitation on Mr. Garcia.

41. Almost one-half hour later, Mr. Garcia was pronounced deceased and emergency medical personnel ended CPR.

42. According to Mr. Garcia's certificate of death, an autopsy was performed on the body, the manner of death was deemed to be a homicide, and the immediate cause of death was stated as "multiple gunshot wounds."

43. Five bullets from Deputy Moran's firearm hit Mr. Garcia's body. From this, Plaintiffs draw a reasonable inference that Deputy Moran at no time intended to merely disable Mr. Garcia, but rather intended to kill him.

44. Following the death of Mr. Garcia, Ms. Garcia was hospitalized for trauma and ongoing mental distress.

45. Mr. Garcia's children suffer from the loss of their father and the tragic circumstances of his death.

## II. Bexar County's Use of Force Policy

46. Sheriff Javier Salazar has been the Sheriff of Bexar County since he took office in January 2017.

47. As the Sheriff of Bexar County, Sheriff Salazar is the policymaker for Bexar County in the area of law enforcement.

48. At the time that Moran shot and killed Mr. Garcia, BCSO maintained a use-of-force policy that had last been revised on April 15, 2014.

49. Prior to the killing of Mr. Garcia, Bexar County—through its policymaker, Sheriff Salazar—was aware that its use-of-force policy needed to be revised. Sheriff Salazar acknowledged, prior to the incident, that the department's use-of-force and officer-involved shooting policies were wordy and confusing, and that, "[w]hen you start getting into ambiguities in your policy, I think you're asking for trouble."[1]

---

[1] Emilie Eaton, *Bexar County will review its training policies after shooting death of 6-year-old*, SAN ANTONIO EXPRESS-NEWS (Jan. 7, 2018), *available at* https://www.expressnews.com/news/local/article/Bexar-County-will-review-its-training-policies-12479309.php (last visited March 2, 2022).

50. Bexar County, its policy makers, and Sheriff Salazar were also aware of the terrible consequences of failing to revise this policy. Between April 15, 2014, and March 9, 2020, BCSO deputies had similarly used unlawfully excessive force to kill at least three other people.

51. The first incident involved Gilbert Flores and occurred on August 28, 2015. Although Flores did not have a firearm, two deputies opened fire on Flores as he stood "motionless in the surrender pose, his feet still stationary." *Amador v. Bexar Cty.*, No. 5:15-CV-810-RP, 2017 WL 4562895, at *2 (W.D. Tex. Oct. 11, 2017), *appeal dismissed sub. nom.* Amador v. Vasquez, 961 F.3d 721 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1513 (Mar. 8, 2021).

52. The second incident occurred on December 21, 2017, and involved Amanda Jones and Kameron Prescott—"[e]ven though Amanda was unarmed, the deputies discharged their weapons approximately eighteen times killing Amanda and six-year-old Kameron." *Prescott v. Bexar Cty.*, No. SA19CV1392JKPRBF, 2021 WL 812115, at *1 (W.D. Tex. Mar. 3, 2021).

53. In both cases, deputies failed to use reasonable non-deadly force or other measured and ascending de-escalation techniques before resorting to the use of deadly force. Still, as of March 9, 2020, the date that Deputy Moran shot and killed Mr. Garcia, the BCSO use-of-force policy had remained unchanged since April 15, 2014.

54. The ambiguities and deficiencies in BCSO's use-of-force policy include, but are not limited, to:

    a. Permitting an individual deputy to use a subjective standard to determine the use of force that the deputy believes is reasonable, instead of utilizing an objective reasonableness standard;

    b. Failing to require officers to issue a verbal warning prior to using deadly force;

c.  Failing to clearly and unambiguously require officers to use only measured, ascending, and proportional force; and

d.  Failing to appropriately address or encourage de-escalation techniques to avoid the need for any force and to avoid a deputy putting himself in a position where force or deadly force becomes necessary.

55. BCSO and Sheriff Salazar knew of the inadequacies in the use-of-force policy in advance of this incident. They also knew that failing to adopt adequate policies had deprived members of the public of constitutional rights and that additional deprivations were likely. Despite their knowledge, they responded with deliberate indifference by doing nothing to revise the inadequate policies.

56. BCSO made significant changes to its use-of-force policy, effective June 26, 2020, demonstrating both the need for and the feasibility of such changes.

57. For instance, the 2014 policy, in effect at the time Mr. Garcia was killed, states: "In each instance of the use of force, the officer should exhaust every reasonable means of employing the minimum amount of force to affect an objective before escalating to the next, more forceful method. *However, an officer is not required to engage in prolonged combat or struggle rather than resorting to that method which will most quickly and safely bring the situation under control.*" (emphasis added).

58. In the June 2020 revisions, made after Mr. Garcia's death, this section of the use-of-force policy was significantly altered: "When use of force is objectively reasonable and necessary, Deputies shall exhaust every reasonable means of employing the minimum amount of force to effect a legitimate law enforcement objective before escalating to the next, more forceful method."

59. As a direct result of BCSO's vague and inadequate use-of-force policy in effect on March 9, 2020, Deputy Moran failed to utilize any of the reasonable means of employing minimum force that were available to him. He did not give any verbal commands to Mr. Garcia. He did not allow Sergeant Reyes to use his taser. He did not attempt to use his own taser. He did not warn Mr. Garcia that he would shoot.

60. Instead, Moran immediately resorted to the use of deadly force, without any regard for Mr. Garcia's life. Additionally, in doing so, Moran did not consider or, alternatively, considered and discounted the high risk of injuring Ms. Garcia.

61. Mr. Garcia was not threatening harm to the officers or to Ms. Garcia. Had Moran employed measured, ascending use of force, the shooting at issue would not have occurred.

62. The Elmendorf Police Department's use-of-force policy, together with the actions taken by Sergeant Reyes pursuant to that policy, further demonstrates that Bexar County's inadequate use-of-force guidance was the moving force behind Moran's killing of Mr. Garcia.

63. In pertinent part, the Elmendorf use-of-force policy states: "Police officers, finding it necessary to use force to achieve a lawful objective, exhaust every reasonable means of employing the minimum amount of force to effect the objective before escalating to the next, more forceful method. However, the type and extent of force may vary, it is the policy of this department that officers use only that amount of objectively reasonable force which appears necessary under the circumstances to successfully accomplish the legitimate law enforcement purpose in accordance with this policy."

**CAUSES OF ACTION**

**COUNT ONE:**
**42 U.S.C. § 1983**
**BROUGHT BY PLAINTIFFS AGAINST DEFENDANT BRANDIN JOHN MORAN FOR**
**EXCESSIVE FORCE USED ON JESUS BENITO GARCIA**

64. Plaintiffs adopt and incorporate by reference all preceding paragraphs as if fully set forth herein.

65. Pursuant to the prohibition against unreasonable searches and seizures safeguarded by the Fourth and Fourteenth Amendments to the U.S. Constitution, Mr. Garcia had the right to be free from excessive use of force by local law enforcement officials.

66. Deputy Moran's immediate use of lethal force against Mr. Garcia, without even reasonably assessing the scene, let alone using measured and ascending non-lethal force, was objectively unreasonable under the circumstances. At the time he was shot, Mr. Garcia was threatening self-harm and pleading with his wife not to leave him. He posed no imminent or significant threat or danger to others and was not actively resisting arrest or attempting to evade arrest by flight.

67. Mr. Garcia was not engaged in verbal or physical threats against others prior to being shot and killed by Deputy Moran.

68. Sergeant Reyes' actions on the scene, giving verbal commands, holstering his firearm, and preparing to transition to a taser, further demonstrate that Deputy Moran acted unreasonably by firing seven shots within seconds of entering the home.

69. Deputy Moran was acting under color of state law during the time period relevant to this claim.

70. Deputy Moran's use of excessive and lethal force against Mr. Garcia actually and directly caused his death.

71. Deputy Moran's use of force was intentional, purposeful, and knowing.

72. Deputy Moran acted in reckless disregard for Mr. Garcia's life, depriving him of his well-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

73.  Plaintiffs are entitled to recover actual, consequential, and compensatory damages from Deputy Moran, including but not limited to past and future medical costs and funeral expenses, past and future pain and suffering, and past and future mental anguish.

74. Deputy Moran acted willfully, deliberately, maliciously, and with reckless disregard for Mr. Garcia's rights, entitling Plaintiffs to recover punitive damages from Moran.

75. Deputy Moran is liable to Plaintiffs for their attorneys' fees and costs necessary to enforce their rights, pursuant to 42 U.S.C. § 1988.

**COUNT TWO:**
**42 U.S.C. § 1983**
**BROUGHT BY PLAINTIFFS AGAINST DEFENDANT BRANDIN JOHN MORAN**
**FOR FAILURE TO PROVIDE MEDICAL CARE TO JESUS BENITO GARCIA**

76. Plaintiffs adopt and incorporate by reference all preceding paragraphs as if fully set forth herein.

77. Under the Fourteenth Amendment, Mr. Garcia had the right to medical attention and the right not to have his serious medical needs met with deliberate indifference.

78. Instead of providing medical assistance to Mr. Garcia, Deputy Moran radioed into dispatch, "I got one." He did nothing other than pace back and forth for approximately seventeen minutes as Mr. Garcia lay bleeding on the floor.

79. Despite the obvious risk of harm to Mr. Garcia, Deputy Moran did not attempt to stem the bleeding, did not attempt cardiopulmonary resuscitation, and did not provide any form of medical care or first aid.

80. Deputy Moran has extensive training, including tactical first aid, general first aid, cardiopulmonary resuscitation, and tactical trauma care. Deputy Moran therefore knew that failing to render aid after he had shot Mr. Garcia five times created an excessive risk of harm to Mr. Garcia.

81. Still, Deputy Moran disregarded that risk and did nothing for approximately seventeen minutes before EMS arrived. When they arrived at the home, EMS deemed it necessary to render medical aid including cardiopulmonary resuscitation. Mr. Garcia was not pronounced deceased until approximately twenty-six minutes after EMS arrived.

82. The BCSO policy regarding the use of force lists providing medical assistance as the third highest priority for responding officers.

83. In the seventeen minutes before EMS arrived, Deputy Moran was not engaged in any other priority activity. He was not stopping violent behavior and was not rescuing victims. Under BCSO policy, Deputy Moran was required to provide medical assistance to Mr. Garcia.

84. Deputy Moran responded to the situation unreasonably. He disregarded his training, disregarded BCSO policy, and disregarded Mr. Garcia's right to medical care. Deputy Moran had a subjective knowledge of a substantial risk of serious harm to Mr. Garcia but responded with deliberate indifference.

85. Deputy Moran's failure to render aid to Mr. Garcia actually and directly caused Mr. Garcia's death. Had Moran acted in accordance with BCSO policy and his training he could have saved Mr. Garcia's life.

86. Plaintiffs are entitled to recover actual, consequential, and compensatory damages from Deputy Moran, including but not limited to past and future medical costs and funeral expenses, past and future pain and suffering, and past and future mental anguish.

87. Deputy Moran acted willfully, deliberately, maliciously, and with reckless disregard for Mr. Garcia's rights, entitling Plaintiffs to recover punitive damages from Moran.

88. Deputy Moran is liable to Plaintiffs for their attorneys' fees and costs necessary to enforce their rights, pursuant to 42 U.S.C. § 1988.

**COUNT THREE:**
**42 U.S.C. § 1983**
**BROUGHT BY PLAINTIFFS AGAINST BEXAR COUNTY UNDER *MONELL***

89. Plaintiffs adopt and incorporate by reference each preceding paragraph as if fully set forth herein.

90. Bexar County—through the decisions of its policymaker Sheriff Salazar—was directly responsible for the deprivation of Mr. Garcia's constitutional rights as described in Plaintiffs' First Cause of Action and is thus subject to liability under 42 U.S.C. § 1983. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 691 (1978) ("Monell").

91. Bexar County adopted and employed a vague and constitutionally inadequate policy pertaining to the use of force and use of deadly force by its officers, as described above.

92. Despite Sheriff Salazar's awareness of a pattern of incidents in which BCSO officers used excessive deadly force and his own admission that the policy was "asking for trouble," BCSO maintained in effect and failed to update its inadequate use-of-force policies, with deliberate indifference to the constitutional rights of persons in Bexar County.

93.  This failure served as a proximate cause and the moving force behind the death of Mr. Garcia and the violation of his constitutional rights.

94. Plaintiffs are entitled to recover actual, consequential, and compensatory damages from Bexar County, including but not limited to past and future medical costs and funeral expenses, past and future pain and suffering, and past and future mental anguish.

95. Bexar County is liable to Plaintiffs for their attorneys' fees and costs necessary to enforce their rights, pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

96. Plaintiffs seek a trial by jury of all issues in this case. Fed. R. Civ. P. 38.

## RELIEF REQUESTED

97. WHEREFORE, the above premises considered, Plaintiffs respectfully request that the Court grant them the following relief:

    A. Enter a declaratory judgment that Defendant Moran violated Mr. Garcia's rights under the Fourth and Fourteenth Amendments of the United States Constitution by using excessive force against him;

    B. Enter a declaratory judgment that Defendant Moran violated Mr. Garcia's rights under the Fourteenth Amendment of the United States Constitution by failing to render aid to him;

    C. Enter a declaratory judgment that Defendant Bexar County maintained unconstitutional policies, which were the moving force behind Mr. Garcia's injury;

    D. Award Plaintiffs actual, consequential, and compensatory damages as determined by the jury;

    E. Award Plaintiffs punitive damages, assessed against Defendant Moran, as determined by the jury;

F. Enter a finding that Plaintiffs are the prevailing parties in this case and award

attorneys' fees, litigation costs and expenses, plus pre-trial and post-trial interest

against Defendants pursuant to 42 U.S.C. § 1988; and

G. Award Plaintiffs all other relief as this Court deems just and proper.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID

/s/ *Susan L. Watson*

Susan L. Watson
TSBN: 24028115
Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Tel. (615) 538-0725
Fax (615) 366-3349
swatson@trla.org

Matthew Garcia
TSBN: 24109906
Texas RioGrande Legal Aid, Inc.
1111 North Main Ave.
San Antonio, TX 78212
Tel. & Fax: (210) 212-3755
mgarcia@trla.org

Attorneys for Plaintiffs